UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X

Angelo Occhino and
Dorothy Occhino

                          Plaintiffs,    CV-03-5259 (CPS)

    - against -                          MEMORANDUM OPINION
                                         AND ORDER

Citigroup Inc., and Citicorp,
One Source Facility Services,
Inc., and Golden Plow, LLC
d/b/a/ Golden Plow,

                          Defendants.

---------------------------------------X

SIFTON, Senior Judge.

        Plaintiffs Angelo Occhino and Dorothy Occhino bring

this negligence action against defendants Citigroup, Inc.,

Citicorp ("Citigroup"), One Source Facility Services, Inc. ("One

Source"), and Golden Plow, LLC d/b/a Golden Plow ("Golden Plow")

seeking damages for personal injuries and loss of consortium

arising out of plaintiff Angelo Occhino's alleged slip and fall

on a patch of ice in the parking lot of a Citibank branch

office.[1]  Defendant Citigroup asserts cross-claims for indemnity

against and breach of contract against defendants One Source and

Golden Plow.  Defendant One Source also asserts a third-party

claim for indemnity and contribution against defendant Golden

_____

        [1] Plaintiffs commenced this action against defendant Citigroup on
October 20, 2003.  On April 27, 2004, plaintiffs amended the complaint to add
defendants One Source and Golden Plow.

Plow.[2]

Presently before the Court are several motions. Defendants Citigroup, One Source and Golden Plow each move for summary judgment dismissing plaintiffs' Second Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant Citigroup also moves to (1) amend its Answer to include the above cross-claims;[3] (2) for summary judgment on its cross-claims against One Source; and (3) to strike One Source's Answer, or alternatively, preclude One Source from offering evidence in opposition to Citigroup's cross-claims based on One Source's alleged spoliation of evidence. Plaintiffs also bring a cross-motion to strike One Source's Answer as a discovery sanction pursuant to Fed. R. Civ. P. 37(b) based on One Source's alleged spoliation of evidence. For the reasons that follow, the motions are granted in part and denied in part.

## BACKGROUND

The following facts are drawn from the pleadings,

---

[2] Although defendants Citigroup and One Source assert a cross-claim for indemnity against Golden Plow in their Answers, neither Citigroup nor One Source makes any reference to claims for indemnity against Golden Plow in their present submissions.

[3] On April 19, 2005, defendant Citigroup filed and served an Amended Answer to plaintiffs' Second Amended Complaint, along with a letter to the Court requesting that the amendments be permitted pursuant to Fed. R. Civ. P. 15. (Citigroup Memo at 6). To date, none of the other parties has opposed the request to amend made by defendant Citigroup in its letter brief. As the Court has not yet issued a decision in response to the letter brief, defendant Citigroup requests that the arguments therein be incorporated into its present motion. (*Id.* at 7).

depositions, answers to interrogatories, and admissions on file, together with the affidavits in connection with this motion. The facts are undisputed unless otherwise noted.

Plaintiffs Angelo Occhino and his wife, Dorothy Occhino, are citizens of Freehold, New Jersey. Citigroup is a Delaware corporation with its principal place of business in New York. One Source is a New York corporation with its principal place of business in New York. Golden Plow is a New York corporation and a foreign corporation, with its principal place of business in New York. At all times relevant to this case, Citigroup was the owner, lessor, and lessee of the premises known as Citibank branch no: 132, located at 5810 Amboy Road, Staten Island, New York 10309. Citigroup's ownership of the premises included the parking lot in front of the bank.

## Plaintiff's Accident

On February 24, 2003, between 12:00 and 12:30 P.M., plaintiff Angelo Occhino, a regular bank customer, arrived at the Staten Island branch to make a deposit. (Pl. Ex. I). Because the Citibank parking lot was full, he parked in a parking lot adjacent to Citibank's parking lot. Occhino walked two or three car lengths through the adjacent parking lot to the sidewalk, then walked twelve to fifteen feet on the sidewalk before stepping onto the Citibank parking lot. He did not observe any ice or snow on the sidewalk. Then, he walked through Citibank's

parking lot in order to reach the front door of the bank. (Angelo Occhino Dep., Pl. Ex. C, 9-10, 76-82). While on Citibank's parking lot, Occhino slipped on an area of ice and snow, and fell backwards onto his right elbow, injuring his shoulder and hip. (*Id.* at 15-17). Although he did not observe the area before falling, afterwards he observed it to be an area of ice and snow approximately three by four feet. (*Id.* at 29). He also observed that the snow did not completely cover the ice. (*Id.* at 63). Also, he observed that unlike the area where he fell, in other areas of the parking lot the snow had been removed. (*Id.* at 31).

Occhino was helped to stand by a man he did not recognize. Occhino walked into the bank, made his deposit with the teller, Paula Spinelli, and informed her that he had slipped. Spinelli offered to call an ambulance, but Occhino refused, stating that he was "hurting" and "wanted to go home." (*Id.* at 33; Spinelli Dep. at 15). Occhino was later examined by a physician who informed him that he had a torn rotator cuff and a cracked right hip. He underwent shoulder surgery on May 8, 2003 and subsequent physical therapy. (Angelo Occhino Dep. at 44-45). More than a week after his accident, Occhino filled out an accident report at the Citibank branch. (*Id.* at 34).

<u>Snow Removal Prior to the Accident</u>

According to meteorological records, 22.3 inches of

snow fell, starting February 16, 2003 and ending February 18, 2003. Between February 18, 2003 and the date of plaintiff's accident, February 24, 2003, no further snow fell. (Pl. Ex. F, ¶ 11). During that period, the temperature was sometimes below freezing and sometimes above freezing, leading to multiple "melt and refreeze" events." (Pl. Ex. F., ¶ 11, Ex. J). According to Howard Altschule, a meteorological expert, the ice that plaintiff slipped on was present for at least twelve hours prior to the accident. (Ex. F, ¶ 17).

Pursuant to a written contract dated January 24, 2000, Citigroup retained the services of One Source for "custodial and cleaning services" of certain Citibank branches, including the Staten Island branch. These services included "snow removal" whereby Citigroup "require[d] [that] all snow shall be removed after 2 inches of accumulation upon authorization from a [Citigroup] representative or in accordance with prevailing governmental regulations." (Pl. Exhibit Q, Schedule E, ¶ 1). The contract further provided that:

> [One Source] shall indemnify and hold harmless [Citigroup] against any and all claims and demands...for personal injuries (including death) arising out of, or suffered while engaged in, or caused, in whole or in part, by the execution of the work; [One Source] shall well and truly defend [Citigroup] and shall pay all monies awarded for such damages or injuries (including death) as may be sustained, all costs including attorneys' fees and shall obtain a full acquittance and release in favor of [Citigroup].

(*Id.* ¶ 5). Cornell Zet, a former district manager at One Source,

described the general procedure the two parties would follow to initiate snow removal during the period relevant to this case. Zet would watch the weather channel, and when snow accumulation approached two inches, he would contact Citibank for authorization to proceed. (Zet. Dep, Citigroup Ex. B at 9-10).

One Source subcontracted with Golden Plow for snow removal services at the Staten Island Citibank branch. However, no written contract exited between One Source and Golden Plow for its subcontracting services, and Golden Plow was not a party to the January 2000 contract between One Source and Citigroup. (Harper Dep., Citigroup Ex. D at 77). Golden Plow would perform snow-plowing and salting services upon verbal authorization from One Source. During the period relevant to case, Golden Plow received verbal authorization to perform snow removal services from Zet at One Source. (*Id.* at 78; Zet. Dep. at 45). Gani Paljovic, another One Source supervisor, would then physically inspect any snow removal work done at the Staten Island branch by Golden Plow. (Zet Dep. at 40; Harper Dep. at 92-93).

Prior to plaintiff's accident on February 24, 2003, the last snow removal performed by Golden Plow at the Staten Island branch occurred on February 17, 2003. Golden Plow performed five separate snow removal services, or "five passes," on February 17, 2003, due to the severity of the snowstorm that day. (Harper Dep. at 99-100; Zett Dep. at 52-53). Each "pass"

performed by Golden Plow required a separate authorization from Citibank and One Source. (Harper Dep. at 100). After the snow removal on February 17, 2003, no complaints were reported in that area.

<u>Cornell Zet's Deposition Testimony</u>

Cornell Zet was employed by One Source in February 2003, and his duties involved coordinating snow removal operations at the Staten Island branch. (Zet Dep. at 5-7, 13). He left the employ of One Source in March 2004, and testified as a non-party witness on March 8, 2005. Zet testified that he maintained a "storm folder" for each storm during 2003, which included records of phone calls to Citibank facility managers, invoices and purchase orders relating to snow removal and other documentation. The storm folders were located in the credenza of his office when he left One Source. (*Id.* at 10-12, 16-20, 45-47, 48-50, 56, 77-78). He testified that he kept notes of each visit he made to a site and any complaints he observed or received in personal daytime calendars--"one booklet per month"-- which were stored in boxes labeled by year in his office. He also made entries regarding problems he observed during site visits into a computerized complaint log. (*Id.* at 23-26, 48,57-59). He also described "Supervisor Inspection Reports," which were created by One Source supervisors following their inspection of snow removal work. (*Id.* at 40-41).

On January 28, 2004, plaintiffs served discovery demands on One Source requesting documents relating to snow and ice removal services. One Source's response on February 24, 2004 did not include the four types of documents described by Zet, who at this time, was still employed by One Source. Following Zet's deposition, plaintiffs requested that One Source produce the documents which Zet had identified (e.g. Storm Folders, daytime organizer, complaint log, and Supervisor Inspection Reports). On March 14, 2005, One Source advised plaintiffs that a search had been conducted and these documents could not be located.

Subsequently, plaintiffs sought Magistrate Gold's intervention regarding One Source's failure to produce the requested documents. One Source informed Magistrate Gold on March 25, 2005 that "no responsive documents could be located because they were either discarded or never existed." (Pl. Ex. I). On March 29, 2005, Magistrate Gold issued an order permitting plaintiffs to depose a witness from One Source with knowledge of the documents described in Zet's deposition testimony. (Pl. Ex. J, K). On April 8, 2005, One Source produced Gani Paljevic, who testified that he had no knowledge of the documents described by Zet. (Paljevic Dep. at 7-18, 21).

## DISCUSSION

### Jurisdiction

Jurisdiction for this action is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a).

## Citigroup's Motion to Amend

Citigroup moves to amend its Answer to include cross claims for indemnity and breach of contract against One Source. As previously noted, on April 19, 2005, defendant Citigroup filed an Amended Answer to plaintiffs' Second Amended Complaint, along with a letter to the Court requesting that the amendments be permitted pursuant to Fed. R. Civ. P. 15. (Citigroup Memo at 6).[4] The parties have not opposed Citigroup's request to amend.

Rule 15(a) states that leave to amend "shall be freely given." As the parties have identified no "undue delay, bad faith or dilatory motive on the part of the movant,...undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment," defendant Citigroup's motion to amend is granted. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *accord Williams v. Brooklyn Union Gas Co.*, 819 F. Supp. 214, 223 (E.D.N.Y. 1993).

## Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material

---

[4] Plaintiffs have since filed a "Third Amended Complaint" upon the instruction of this Court, as the previously filed complaint did not properly plead diversity jurisdiction. Defendant Citigroup filed an Amended Answer to the Third Amended Complaint on July 1, 2005.

fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

<u>Negligence</u>

Because the court's jurisdiction is premised on diversity of citizenship, New York law applies to the substantive claims. *See McGrath v. Toys R Us, Inc.,* 356 F.3d 246, 249 (2d Cir.2004). Under New York law, a prima facie case of negligence requires plaintiffs to establish the following: (1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; (3) the plaintiff suffered damages as a proximate result of that breach. *See Solomon v. City of New York,* 66 N.Y. 2d 1026, 1027 (1985). To establish a prima facie case of negligence in a slip and fall action, the plaintiffs must demonstrate either that the defendants "created the condition which caused the accident, or that the defendant[s] had actual or

constructive notice of the condition." *Byofsky v. Waldbaum Supermarkets, Inc*. 210 A.D.2d 280 (N.Y. App. Div. 1994); *Simmons v. Metropolitan Life Ins. Co.*, 84 N.Y.2d 972. Defendants seek summary judgment against plaintiffs on the grounds that they have failed to established a prima facie claim of negligence.

### Citigroup's Motion for Summary Judgment against Plaintiffs

Defendant Citigroup moves for summary judgment dismissing plaintiffs' claims on the ground that Citigroup neither created nor had actual or constructive notice of the condition which caused Angelo Occhino's injury. Plaintiffs provide no evidence that Citigroup either created the hazard or had actual notice of the icy condition.[5] *See Quarles v. Columbia Sussex Corp.,* 997 F.Supp. 327, 332 (E.D.N.Y. 1998); *Gordon v. American Museum of Natural History*, 67 N.Y.2d 836, 837 (N.Y. 1986). However, plaintiffs argue that constructive notice can be imputed to Citigroup.

"To constitute constructive notice, the defect must be visible and apparent, and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Id.* at 837-38 (citing *Negri v. Stop & Shop*, 65 N.Y.2d 625, 626, 491 N.Y.S.2d 151, 480 N.E.2d 740). In a situation involving snow and ice, "there must be evidence that

---

[5] Plaintiffs contend that One Source's alleged spoilation of evidence deprived them of the ability to provide evidence of actual notice.

the defendant knew, or in the exercise of reasonable care, should have known that icy conditions existed and nonetheless failed to exercise due care to correct the situation within a reasonable time after the cessation of the storm or temperature fluctuations which created the dangerous condition." *Polgar v. Syracuse University,* 255 A.D.2d 780 (N.Y. App. Div. 1998)(*citing Porcari v. S.E.M. Mgt. Corp.,* 184 A.D.2d 556,557 (N.Y. App. Div. 1992)). To establish constructive notice, "the plaintiff must present evidence of the length of time the condition existed prior to the alleged fall." *Tedesco v. Norfolk Southern Corp.,* 2002 WL 1628874, at *3 (W.D.N.Y. 2002); *Gordon,* 67 N.Y.2d at 838.

Plaintiffs cite the deposition testimony of their meteorological expert, Howard Altschule, who testified that based on the meteorological evidence, the snow originated during a storm on February 17, 2003, and the ice which caused Angelo Occhino's fall was formed at least 12 hours prior to the accident on February 24, 2003. (Pl. Ex. F, ¶ 17). Plaintiffs contend that this evidence provides a basis on which to impute constructive notice to Citigroup. In response, Citigroup argues that the expert's opinion is too speculative to support a finding of constructive notice. In support of its argument, Citigroup cites cases in which New York courts held that the testimony of meteorological experts "opining that freeze/thaw cycles in the days prior to the accident could have caused the ice patch is too

speculative to raise an issue of fact as to whether defendant had constructive notice." *Wimbush v. City of Albany,* 285 A.D.2d 706, 727 (N.Y. App. Div. 2001); *see also Borden,* 271 A.D.2d at 864; *Porcari,* 184 A.D.2d at 557; *Uhlinger v. Gloversville Enlarged School District,* 796 N.Y.S.2d 437 (N.Y. App. Div. 2005).

While a general "freeze/thaw" theory may be speculative, the existence of specific expert testimony and meteorological evidence as to when the icy condition formed can create a triable issue of fact as to whether a defendant had constructive notice. *Bullard v. Pfohl's Tavern, Inc.,* 11 A.D.3d 1026, 1027 (N.Y. App. Div. 2004)("professional meteorologist averred that, because of precipitation overnight and falling temperatures in early morning, ice and black ice would have formed in area between 8:30 a.m. and 8:45 a.m.," raising triable issue of fact); *see also Boyko v. Limowski,* 223 A.D.2d 962, 963 (3d Dept. 1996) (plaintiff's submission of meteorological evidence indicating that the ice existed for at least three hours prior to her accident was sufficient to create a triable issue of fact with regard to constructive notice); *Uhlinger v. Gloversville Enlarged School Dist.*, 2005 WL 1368073 (N.Y. App. Div. 2005)("While the freeze/thaw theory expounded by plaintiffs' expert meteorologist was speculative...his meteorological data pointed out that approximately five inches of snow fell over the day or two before plaintiff's fall and no precipitation fell for

approximately eight hours prior to her fall."). In this case, the deposition testimony of plaintiffs' expert and the supporting meteorological evidence, which indicate that the ice formed at least twelve hours prior to the accident, are sufficient to create an issue of fact as to whether defendant Citigroup had constructive notice of the condition.

Defendant Citigroup also argues that plaintiff Angelo Occhino's failure to observe the icy condition prior to his fall weighs against a finding of constructive notice. (Citigroup Reply Memo at 4). While Angelo Occhino did not observe the ice before his accident, his deposition testimony indicates that immediately after his fall, he observed the icy patch to be three by four feet, and not covered in its entirety by snow. Angelo Occhino's deposition testimony regarding the appearance of the icy condition is sufficient to raise an issue of fact as to whether the defect was "visible and apparent," for purposes of constructive notice. *See Pugliese v. Utica Nat. Ins. Group, Inc.,* 292 A.D.2d 992, 992-93 (N.Y. App. Div. 2002). Defendant Citigroup has failed to show that no triable issue of fact exists and that it lacked constructive notice as a matter of law. Accordingly, Citigroup's motion for summary judgment against the plaintiffs is denied.

### Golden Plow and One Source's Motions for Summary Judgment Against Plaintiffs

Defendants Golden Plow and One Source each move for

summary judgment dismissing plaintiffs' claims on the grounds
that they did not owe Angelo Occhino a duty of care, and they did
not have actual or constructive notice of the icy condition.
Ordinarily, contractual obligations will not create a duty of
care towards a third party unless: (1) the contracting party has
"launched a force or instrument of harm," or "created or
exacerbated a dangerous condition;"[6] (2) the plaintiff
detrimentally relied on the continued performance of the
contracting party's duties; and (3) the contract is so
comprehensive and exclusive that it completely displaces the
other contracting party's duty toward the third party. *See
Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 141-42
(2002). Plaintiffs contend that One Source owed them a duty of
care on account of each of the three factors described above.
Plaintiffs contend that Golden Plow owed them a duty of care on
account of the first factor, i.e. that Golden Plow's snow removal
on February 17, 2003 launched a force of harm which created or
exacerbated a dangerous condition.

*Creation or Exacerbation of Hazard*

Plaintiffs contend that defendants One Source and
Golden Plow, having undertaken to clear the snow and ice, failed
to exercise reasonable care on February 17, 2003, and thus,

---

[6] These concepts are "applied interchangeably," and one who "'creates or
exacerbates' a harmful condition may generally be said to have 'launched' it."
*Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 142-43 (2002).

created or exacerbated the snow related hazard.  Having
undertaken to remove snow, a contractor is required "to exercise
reasonable care in doing so or be held liable in negligence where
its acts created or increased the hazard inherent in ice and
snow[.]"  *Glick v. City of New York*, 139 A.D.2d 402, 526 N.Y.S.2d
464 (1988); *Espinal,* 98 N.Y.2d at 141-42 ("[A] defendant who
undertakes to render services and then negligently creates or
exacerbates a dangerous condition may be liable for any resulting
injury.").

Plaintiffs argue they have been deprived of the
opportunity to present direct evidence of One Source and Golden
Plow's negligent performance due to the alleged spoliation of
relevant documents by One Source.  Plaintiffs contend, however,
that Golden Plow's incomplete or inadequate snow removal and One
Source's failure to adequately inspect and supervise the work can
be inferred.  Plaintiffs refer to deposition testimony of expert
meteorologist Howard Atschle, who stated that the icy condition
on February 24, 2003 originated from the snow event of February
17, 2003, which was also the day on which Golden Plow performed
"five passes" of snow removal at the State Island branch.
Plaintiffs argue that this, together with the presence of ice and
snow seven days later on February 24, 2003, creates an issue of
fact as to whether these defendants created or exacerbated the
hazardous condition.

In *Espinal,* the New York Court of Appeals rejected the argument that a contractor launched a force or instrument of harm because its snow removal operations could have left "residual snow or ice on the plowed area" which later melted and refroze. The court held that "by merely plowing the snow, [the contractor] cannot be said to have created or exacerbated a dangerous condition." *Espinal,* 98 N.Y.2d at 142. Plaintiffs have offered no other evidence of defendant Golden Plow's negligence other than the fact that it performed snow removal at the Staten Island branch on February 17, 2003 and that Angelo Occhino observed ice seven days later on February 24, 2003. *See Prenderville v. International Service Systems, Inc.*, 10 A.D.3d 334, 781 N.Y.S.2d 110 (N.Y. App. Div. 2001) (citing *Espinal*, supra)( "[C]onclusory allegations that a defendant's snow removal operations created or increased a dangerous snow-related hazard are insufficient to impose liability[.]").[7] This is insufficient to create a

---

[7] Although plaintiffs cite *Genen v. Metro North Commuter R.R.*, 261 A.D.2d 211, 212 (N.Y. App. Div. 1999) and *Prenderville v. International Service Systems, Inc.*, 10 A.D.3d 334 (N.Y. App. Div. 2001) in support of this argument, those cases are distinguishable from the present case. In *Genen,* the plaintiff, who slipped on a railroad platform, presented evidence demonstrating that the contractor had performed snow and ice removal operations "on the day before the accident" in the area where plaintiff slipped as well as "evidence showing that at the time of the accident, the area where he slipped had not been sanded and was covered with dangerous ice patches." *Id.* The court held that the causal connection between the contractor's snow removal, which occurred just one day before the accident, and the hazardous icy condition was "far from speculative." *Id.* at 215. Similarly, in *Prenderville,* a plaintiff who sustained injuries as a result of a slip-and-fall accident on an icy curb presented the testimony of a security guard who witnessed the contractor perform snow removal operations on the date of the accident, as well as evidence that the area was not properly salted or sanded. *Id.* at 337. In this case, however, the snow removal operations were not performed the day of or even the day before the accident, but a full week

reasonable inference that Golden Plow launched a force or instrument of harm. As plaintiffs have failed to demonstrate that Golden Plow owed them a duty of care, Golden Plow is entitled to summary judgment on plaintiffs' negligence claim as a matter of law.

In regard to One Source, plaintiffs contend that the records allegedly spoliated by One Source would have provided evidence of "incomplete and incompetent work at the accident site." (Pl. Memo at 13). Plaintiffs argue that this inference in conjunction with the inference of the negligence of One Source's agent, Golden Plow, creates an issue of fact as to whether One Source created or exacerbated the dangerous condition. Having determined that Golden Plow's negligence cannot be inferred, and there being no evidence that One Source committed any affirmative acts which launched a force of harm, plaintiffs have failed to raise a triable issue of fact regarding One Source's duty of care due to creation or exacerbation of a hazardous condition. *See e.g. Genen,* 261 A.D.2d 211 at 213 (distinguishing negligent "affirmative" action from the mere failure to perform a contractual obligation, which "will

---

before the accident. Moreover, in *Genen*, on the basis of the evidence presented, the court could explicitly reject the argument that the icy hazard might have formed after the negligent plowing. *Id.* at 215. Here, even the plaintiffs acknowledge that the icy condition which caused Angelo Occhino's fall did not arise until several days after the snow plowing. Thus, unlike the facts in *Genen* and *Prenderville,* the causal connection between Golden Plow's snow removal and the hazardous condition is speculative.

generally not give rise to tort liability vis-a-vis noncontracting third parties" in the absence of detrimental reliance); *Eaves Brooks Costume Company Inc. v. Y.B.H. Realty Corp.,* 76 N.Y.2d 220, 225 (1990)("in the ordinary case...mere inaction [of a contractual obligation], without more, establishes only a cause of action for breach of contract.").

*Detrimental Reliance*

Plaintiffs contend that Angelo Occhino detrimentally relied on One Source's snow removal work. "[T]ort liability may arise where "performance of contractual obligations has induced detrimental reliance on continued performance" and the defendant's failure to perform those obligations "positively or actively" works an injury upon the plaintiff." *Espinal*, 98 N.Y.2d at 140. In addition, "[t]he nexus for a tort relationship between the defendant's contractual obligation and the injured non-contracting plaintiff's reliance and injury must be direct and demonstrable, not incidental or merely collateral." *Palka v. Servicemaster Mgmt. Srvs. Corp.*, 83 N.Y.2d 579, 587 (1994). Where there is no evidence that a plaintiff had any knowledge of a snow removal contract and plaintiff relies solely on his own observations of the surrounding conditions at the time of his accident, a plaintiff has failed to make a valid claim of detrimental reliance. *See Bugiada v. Iko*, 274 A.D.2d 368 (N.Y. App. Div. 2000).

Here, the only evidence presented by plaintiff is Angelo Occhino's deposition testimony that he was looking straight ahead towards the bank entrance when he slipped and fell, and he did not observe the snow and ice until after the accident. (Pl. Memo at 14). Plaintiffs provide no evidence that Angelo Occhino had actual knowledge of the contract or that he relied on anything other than his own observations while walking through the parking lot. As such, plaintiffs have failed to raise an issue of fact concerning detrimental reliance on One Source's continued performance of its contractual obligations.

*Comprehensive Contract*

Plaintiffs contend that the maintenance contract between One Source and Citigroup was comprehensive and exclusive and entirely displaced Citigroup's duty to maintain the premises. One Source responds that because it could not commence snow removal services at the Staten Island Citibank branch without prior authorization from Citibank, it did not displace Citibank's duty as a matter of law.

Pursuant to the terms of the contract, Citigroup "require[d] [that] all snow shall be removed after 2 inches of accumulation upon authorization from a [Citigroup] representative or in accordance with prevailing governmental regulations." (Pl. Exhibit Q, Schedule E, ¶ 1). The deposition testimony of Cornell Zet and Timothy Harper also indicate that One Source generally

required approval from Citibank's Facilities Department before commencement of snow removal services. (Harper Dep. at 19, 22-23; Zet Dep. at 9-10, 15-16). Cornel Zet also testified that while One Source did not keep salt or snow melting substances for it own use on-site at the Staten Island branch, prior to the start of snow season, One Source would deliver a fifty pound bag of salt to every Citibank branch at Citibank's request. (Zet. Dep. at 64-65).

Plaintiffs point to provisions of the contract, such as those which made One Source responsible for hiring staff and supervisory staff for "supervision of all cleaning services," as well as "management level supervisory staff," as indicative of its comprehensive nature (Contract ¶¶ 7, 11, 12). However, ultimately, the contract required One Source to render reports of "inspections, maintenance schedules, equipment, staffing, emergencies, security problems, or any related events at the Premises" upon the bank's request (Pl. Ex. Q, ¶ 23). Given the contractual requirement of Citigroup's approval prior to the commencement One Source's snow removal activities, the requirement of regular reporting upon Citigroup's request, and evidence indicating that Citigroup performed at least some salting services, I find that the contract did not completely displace Citigroup's duty to maintain the premises safely. *See Borden v. Wilmorite, Inc*. 271 A.D.2d 864, 865 (N.Y. App. Div.

2000)(finding no comprehensive contract where the decision as to
when each plowing would commence was made by property owner);
*Phillips v. Young Men's Christian Ass'n*, 215 A.D.2d 825, 826
(N.Y. App. Div. 1995) (finding maintenance contract to be non-
comprehensive, even where it required contractor to "perform snow
removal upon an accumulation of one to two inches without
direction or approval from the YMCA"); *Espinal,* 98 N.Y.2d 136,
140 (N.Y. 2002)(finding that where "by the express terms of the
contract, [contractor] was obligated to plow only when the snow
accumulation...exceeded three inches," the contract was not a
"comprehensive and exclusive property maintenance obligation").
As plaintiffs have failed to raise a issue of fact concerning One
Source's duty of care to third parties under any of the three
relevant tests, One Source is entitled to summary judgement as a
matter of law on plaintiffs' claim of negligence.[8]

### Citigroup's Cross-Claim for Indemnity Against One Source

Citigroup argues that due to the provision for
indemnity contained in the maintenance contract, it is entitled
to summary judgment on its cross-claim against One Source for
full contractual indemnification.  The contract between Citigroup
and One Source provides that:

---

[8]   Having determined that neither One Source nor Golden Plow owed
plaintiff a duty of care, the Court need not address their arguments regarding
their lack of actual or constructive notice.  Moreover, having granted One
Source summary judgment on plaintiffs' negligence claim, One Source's cross-
claims for indemnity and contribution are also dismissed.

> The Contractor hereby agrees to indemnify, defend and hold
> harmless the Bank, and its affiliates, and their respective
> directors, officers, employees and agents, from and against
> all claims, losses, liabilities and expenses (including fees
> and disbursements of counsel) suffered or incurred by the
> foregoing indemnities or any of them on account of or in
> connection with this Agreement and/or any injury to persons,
> including but not limited to death, as well as damage to
> property arising out of or in connection with the
> performance of this Agreement by the Contractor, or its
> employees, agents or subcontractors, or any acts of omission
> or commission of the Contractor, or its employees, agents,
> or subcontractors. . . .Claims and demands which may arise
> out of the sole negligence of the Bank, or any of its
> subsidiaries are not the responsibility of the Contractor.

(Contract, ¶ 27).  A contract which purports to indemnify a party

for its own negligence is void and unenforceable under New York

General Obligations Law Section 5-322.1.[9]  Consequently, to

prevail on summary judgment,"a party to a contract who is a

beneficiary of an indemnification provision must prove itself to

be free of negligence; to any extent that the negligence of such

a party contributed to the accident, it cannot be indemnified

therefor."  *Reynolds v. County of Westchester*, 270 A.D.2d 473,

474, 704 N.Y.S.2d 651 (N.Y. App. Div. 2000).  In this case, as

Citigroup has failed to establish its lack of negligence as a

matter of law, it cannot prevail on summary judgment.  See

*Penderville v. International Service Systems, Inc.*, 10 A.D.3d

334, 336 (1st Dept. 2004)(holding that the indemnification claims

---

[9] New York General Obligations Law Section 5-322.1 provides that "a
covenant, promise or understanding...purporting to indemnify or hold harmless
the promisee against liability for damage arising out of bodily injury to
persons...caused by or resulting from the negligence of the promisee...is
against public policy and is void and unenforceable."

cannot be resolved summarily because "there is evidence in the record that raises a triable issue" with respect to the proponent's negligence.).

<u>Citigroup's Cross-Claim for Breach of Contract Against One Source</u>

Citigroup argues that it is entitled to summary judgment on its cross-claim against One Source for breach of contract because One Source failed to procure insurance naming Citigroup as an additional insured in violation of the written contract between One Source and Citigroup. "It is well settled that a contract to procure or provide insurance coverage is clearly distinct from and treated differently than an agreement to indemnify." *Mathew v. Crow Constr. Co.*, 220 A.D.2d 490 (1995)(citing *Roblee v. Corning Community Coll.*, 134 A.D.2d 803, 804 (1987)). "Whereas the essence of an indemnification agreement is to relieve the promisee of liability, an agreement to procure insurance specifically anticipates promisee's continued responsibility for its own negligence for which the promisor is obligated to furnish insurance." *Kinney v. G.W. Lisk Co.*, 557 N.Y.S.2d 283, 285 (1977). "As a result, New York courts continually have construed agreements to procure insurance coverage as extending to *all* liability arising out of the activities contemplated by the agreement between the parties, including liability based on the promisee's own negligence." *Lawlor v. MFD America's Corporation,* 1995 WL 110090, at *4

(S.D.N.Y. 1995).[10]

The insurance provision of the contract between Citigroup and One Source states in relevant part that:

> The Contractor [One Source] will...at its expense carry and renew...(iii) Comprehensive General Liability ("CGL") insurance in the amount of $1,000,000 combined single limit covering both bodily injury and property damage, including but not limited to coverage for its indemnities to the Bank under this Agreement, and (iv) umbrella liability in the amount of $5,000,000...The Bank and its affiliates, including Citigroup, shall be additional insured under the Contractor's CGL policy with respect to liability arising out of any act or omission pertaining to the performance of this Agreement.

(Contract ¶ 27). Although One Source took out a CGL policy, it is clear that Citigroup was not named as an additional insured party as required by the contract. (Citigroup Ex. L, "CGL Policy"). One Source does not dispute that it failed to procure insurance naming Citigroup as additional insured as required by the contract. Accordingly, One Source is liable for any damages resulting from the activities contemplated by the agreement. *See e.g. Lawlor,* 1995 WL at *4 (citing *Clapper v. County of Albany,* 591 N.Y.S.2d 258, 259 (N.Y. App.Div. 1992); *Cardozo v. Mayflower Center, Inc.,* 16 A.D.3d 536 (N.Y. App. Div. 2005).

One Source contends that Citigroup is not entitled to damages because plaintiff's accident was not an activity

---

[10] Thus, unlike a contractual indemnity provision, a provision which requires a contractor to purchase liability insurance for both its own and the owner's negligence does not violation N.Y. Gen. Obl. Law § 5-322.1.

contemplated by the agreement.  Specifically, One Source refers
to language in the insurance procurement provision, which
provides that One Source is to "indemnify" Citigroup for any
claims "arising out of" One Source's work under the agreement.
One Source argues that plaintiff's accident did not "arise out
of" work done by One Source.  (One Source Reply Memo at 24).
Citigroup argues in response that because the insurance provision
requires the procurement of insurance "including, *but not limited
to* coverage for its indemnities to the bank" (emphasis added),
the provision cannot be interpreted as requiring insurance solely
for indemnification purposes.  (Contract, ¶ 17).  I find that
plaintiff's accident was an activity contemplated by the
agreement.

New York courts have held that "[t]he focus of a policy
clause is not on the precise cause of the accident but [rather]
the general nature of the operation in the course of which the
injury was sustained."  *Moll v. Wegmans Food Markets, Inc.*, 300
A.D.2d 1041, 1042-43, 755 N.Y.S.2d 131 (N.Y. App. Div. 2002)
(citations omitted).  In *Moll*, a third-party defendant entered
into an agreement with the third-party plaintiff to perform solid
waste removal services, which included a provision to obtain
insurance naming the third-party plaintiff as an additional
insured.  The third-party defendant failed to procure such
insurance but argued that the third-party plaintiff "offered no

evidence that the solid waste disposal agreement covered the underlying accident." *Id.* at 1042. The court held that "evidence that plaintiff slipped on a substance that allegedly came from the dumpster is sufficient to establish that the injury was covered by the agreement." *Id.* at 1043. Here, One Source agreed to maintain the sidewalks, walkways, and parking lots "free of snow and ice at all times to prevent hazard to public and personnel." (Contract, Schedule B). As such, evidence that Angelo Occhino injured himself on an icy condition is sufficient to establish that the injury was covered by the agreement. See *Moll*, 300 A.D.2d at 1042-43.

Having determined that One Source breached the insurance procurement provision of the contract and that plaintiff's accident was an activity contemplated by the agreement, One Source is liable to Citigroup for the resulting damages for failure to obtain the required insurance coverage, "including the liability of [Citigroup] to the plaintiff, and the costs incurred in defending against the plaintiff's action." *Keelan v. Sivan*, 651 N.Y.S.2d 178, 180 (N.Y. App. Div. 1996). The New York Court of Appeals recently explained in *Incahustegui v. 666 5th Ave Ltd. Partnership,* 96 N.Y.2d 111 (N.Y., 2001), that if the promisee procures his own insurance, the resulting damages need not include liability to the plaintiff, as that is covered by the procured insurance, and the resulting damages amount only

to the premiums paid to obtain the additional insurance. *Id.* at
125. In *Incahustegui*, however, the promisee procured insurance
from an outside source, whereas here, Citigroup was self-insured
and did not procure insurance from an outside source. Because
Citigroup insured itself, any costs incurred as a result of One
Source's alleged failure to name it as an insured party would be
out of pocket. "Damages for breach of contract are intended to
put the aggrieved party in the same economic position he would
have been in if the contract had been performed." *Id.* at 124.
Accordingly, Citigroup is entitled to resulting damages from One
Source's breach of contract, including any liability found
against Citigroup in favor the plaintiffs and attorney's fees.

<u>Spoliation</u>

Plaintiffs and defendant Citigroup move pursuant to Fed.
R. Civ. P. 37(b) to strike the pleadings of One Source based on
its alleged spoliation of evidence and failure to provide
discovery, or alternatively, to preclude One Source from offering
evidence. Spoliation is destroying, significantly altering, or
failing to preserve property for another's use as evidence in
pending or reasonably foreseeable litigation. *West v. Goodyear
Tire & Ribber Co.,* 167 F.3d 776, 779 (2d Cir.1990). A federal
district court may impose sanctions under Fed. R. Civ. P. 37(b)
when a party spoliates evidence in violation of a court order.
Even without a discovery order, a district court may impose

sanctions for spoliation, exercising its inherent power to
control litigation. *See id.* A party seeking sanctions for
spoliation has the burden of proving that the: (1) alleged
spoliator had an obligation to preserve the evidence; (2) acted
culpably in destroying the evidence; and (3) that the evidence
would have been relevant to the aggrieved party's case. *See
Golia v. Leslie Fay Co., Inc.,* 2003 WL 21878788 at *9 (S.D.N.Y.
2003).

Although courts have broad discretion in crafting a
proper sanction for spoliation, the sanction should be designed
to: (1) deter parties from engaging in spoliation; (2) place the
risk of an erroneous judgment on the party who wrongfully created
the risk; and (3) restore "the prejudiced party to the same
position he would have been in absent the wrongful destruction of
evidence by the opposing party." *Kronisch v. United States,* 150
F.3d 112, 126 (2d Cir.1998). Dismissal of a lawsuit, or its
analogue, striking an answer, is appropriate if "there is a
showing of willfulness, bad faith, or fault on the part of the
sanctioned party;" however, because it is a "drastic remedy...it
should be imposed only in extreme circumstances, usually after
consideration of alternative, less drastic sanctions." *West,* 167
F.3d at 789-90 (citing *John B. Hull, Inc. v. Waterbury Petroleum
Prods., Inc.,* 845 F.2d 1172, 1776 (2d Cir.1988)).

Here, the parties allege that One Source spoliated the

documents described in Cornel Zet's March 8, 2005 deposition
testimony, i.e. the Storm Folders, personal daytime calendar,
complaint log, and Supervisor Inspection Reports.  One Source
responds that the Storm Folders and the daytime calendar were
believed to be personal notes of Cornel Zet rather than business
records and were discarded sometime after Zet left One Source's
employ in March 2004.  In addition, One Source contends that the
computerized complaint log and the Supervisor Inspection Reports
never existed, and that much of the information contained in the
storm folder is public, has already been exchanged in the course
of discovery, and/or is available from the other defendants in
this case. (One Source Reply Memo, at 3-5).

I find many aspects of this situation to be troubling.
One Source contends that it, like the parties seeking sanctions,
was unaware of the existence or the nature of these documents
until Zet provided deposition testimony on March 8, 2005.
However, One Source was served with plaintiffs' discovery demands
for documents relating to snow and ice removal services on
January 28, 2004, while Zet was still in One Source's employ.
During the period relevant to this case, Zet was the person in
charge of One Source's record-keeping relating to snow removal
efforts at the Citibank branches.  Thus, he would have been the
natural person to consult upon One Source's receipt of
plaintiffs' discovery demands.  A "party has a duty to retain

evidence that it knows or reasonably should know may be relevant to pending or future litigation." *Kronisch,* 150 F.3d at 126. One Source has acknowledged that the Storm Folders and the personal daytime calendar were discarded sometime after Zet left One Source's employ. While Zet's personal daytime calendar could be seen as a personal item for which relevance to the litigation would not reasonably have been known, the same cannot be said about the Storm Folders. The Storm Folders were manila folders labeled with the date of a particular storm, which contained records of phone calls made by Zet to Citibank facility managers, snow removal forms filed by drivers that contained information regarding the driver's arrival and departure from each location and work performed, relevant climatological data, and copies of purchase orders and invoices. (Zet Dep. at 10-11, 16-21). Clearly, these were business records relevant to the litigation, which One Source had a duty to retain.

While parties seeking spoliation sanctions are not required to show "bad faith," *Byrnie,* 243 F.3d at 107-08, the "level of intentionality goes directly to the degree of severity of any sanction that may be warranted." *Barsoum v. NYC Housing Authority,* 202 F.R.D. 396, 400 (S.D.N.Y. 2001). More severe sanctions, such as those sought here, require a finding of "bad faith, intentional misconduct or fault in the form of gross negligence." *Id.* (citing *Reilly v. Natwest Markets Group, Inc.,*

181 F.3d 253, 267-68 (2d Cir.1999)).  I find that One Source's discarding of the Storm Folders meets the requisite standard of gross negligence.

However, the party seeking sanctions must also make "some showing indicating that the destroyed evidence would have been relevant to the contested issue," as this goes to "whether there has been prejudice to the party seeking sanctions." *Barsoum,* 202 F.R.D. at 400 (citing *Kronisch,* 150 F.3d at 127). Plaintiffs assert that the driver's reports contained in the storm folders would have provided relevant information such as "timing (relative to the start and stop of the storm) and amount of time spent on each go round."  (Fifer Aff. ¶ 8).  However, it is unclear how this information would be (more than marginally) relevant to the contested issue, i.e. whether One Source owed a duty of care to plaintiffs.  Invoices from Golden Plow already establish that on February 17, 2003, "five passes" were performed by Golden Plow drivers at the Staten Island branch at the direction of One Source.  Similarly, defendant Citigroup fails to demonstrate the relevance of this information to its cross-claims.  Citigroup has, in any case, demonstrated its entitlement to summary judgment as a matter of law on its breach of contract cross-claim against One Source.  Accordingly, the motions to strike the pleadings of defendant One Source, or alternatively, to preclude One Source from offering evidence, are denied.

**CONCLUSION**

For the aforementioned reasons: (1) Defendant
Citigroup's motion to amend its answer to include cross-claims is
granted; (2) Defendant Citigroup's motion for summary judgment
dismissing plaintiffs' claims is denied; (3) Defendant One
Source's motion for summary judgment dismissing plaintiffs'
claims is granted; (4) Defendant Golden Plow's motion for summary
judgment dismissing plaintiffs' claims is granted; (5) Defendant
Citigroup's motion for summary judgment on its cross-claim for
contractual indemnification against One Source is denied; (6)
Defendant Citigroup's motion for summary judgment on its cross-
claim for breach of contract against One Source is granted; and
(7) Plaintiffs' and Defendant Citigroup's motions to strike the
pleadings of Defendant One Source, or alternatively, to preclude
One Source from offering evidence, based on the alleged
spoliation of evidence are denied.

The Clerk is directed to mail a filed copy of this
opinion to all parties and the magistrate judge.

SO ORDERED.

Dated :   Brooklyn, New York

August 26, 2005

By: /s/ Charles P. Sifton (electronically signed)
United States District Judge